IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DAWNA MARTIN, as Guardian
Ad Litem for C.M., a minor, TODD
MARTIN, an individual, and
DAWNA MARTIN, an individual,

Plaintiffs,

v.

HERMISTON SCHOOL DISTRICT
8R, a public body, and individuals
LARRY USHER, DAN EMERY,
DAVID FAAETEETE, and
MATTHEW BRUCK, in their
personal capacities,

Defendants.

No. 3:18-cv-02088-HZ

OPINION & ORDER

Martin Dolan
Patricia Pascone
Dolan Law Group, P.C.
4300 NE Fremont Street, Suite 250
Portland, OR 97213

Attorneys for Plaintiffs

Blake Fry
Karen Vickers
Mersereau Shannon, LLP
111 SW Columbia Street, Suite 1100
Portland, OR 97201

      Attorneys for Defendants

HERNÁNDEZ, District Judge:

      Plaintiffs bring this action under 42 U.S.C. § 1983 alleging that Defendants violated their

Fourteenth Amendment rights when C.M. suffered a serious head injury in the fall of 2016 while

playing football on Hermiston High School's junior varsity football team. C.M. also brings state

law negligence and negligence per se claims against Defendants. Defendants move for summary

judgment on each of Plaintiffs' claims. The Court grants in part and denies in part Defendants'

Motion for Summary Judgment.

## BACKGROUND

      Plaintiffs Todd and Dawna Martin's son, Plaintiff C.M., joined his high school football

team during his sophomore year of high school in 2016. C.M. was placed on the junior varsity

("JV") team. Pascone Am. Decl. Ex. 3 ("C.M. Dep.") 37:13–18, ECF 34-3. He had never played

football before. *Id*. The team's roster listed C.M. as a wide receiver and a defensive back. Fry

Decl. Ex. 1 at 40–41, ECF 16-1. C.M. and other players on his team said that C.M. also played

on "first defense," a specific group of students who played the positions of middle and outside

linebacker. C.M. Dep. 83:13–84:3; Paradiso Decl. ¶ 2, ECF 28. C.M. testified that he also played

the position of starting "bullet" during kickoffs, where his job was to thwart blockers and try to

tackle the receiver carrying the ball for the receiving team. C.M. Dep. 87:6–12.

      Before the 2016–2017 football season, C.M. took an ImPACT test. Fry Decl. Ex. 1 at

89:5–12, ECF 16-1. All high school athletes must take an ImPACT test before the start of every

season. Fry Decl. Ex. 5 ("Emery Dep.") 39:10–40:16, ECF 16-5. The test obtains a baseline level of cognitive functioning that health professionals can compare to post-injury ImPACT testing to determine whether an athlete's cognitive functioning has diminished after an injury. *Id.*

Hermiston School District's Athletic Director, Defendant Usher, oversaw the district's athletic programs. In that role, Defendant Usher was responsible for providing input into and implementing school district policies for concussion management, ensuring coaches received annual concussion training, and supervising coaches and athletic trainers to ensure that they followed the district's concussion policies. Pascone Am. Decl. Ex. 5 ("Usher Dep.") 16:15–21, 21:11–22:22, ECF 34-5. In 2016, Defendant Faateete was Hermiston High School's head football coach. Pascone Am. Decl. Ex. 8 ("Faateete Dep.") 15:6–11, ECF 34-8. In that position, Defendant Faateete was responsible for the entire school's football program and supervised the eleven other coaches of the varsity, junior varsity, and freshman football teams. *Id.* at 15:12–17, 16:11–21. The freshman, junior varsity, and varsity teams had a total of about 85 to 100 players in 2016. *Id.* 27:3–12. Another coach was responsible for coaching Hermiston's JV team during games, but Defendant Faateete led football practices and training for all teams. *Id.*; Pascone Am. Decl. Ex. 4 ("Bruck Dep.") 17:2–10, ECF 34-4.

Defendant Bruck was the head coach of the JV football team in 2016. *Id.* at 14:2–5. At games, Defendant Bruck served as the JV team's point of contact for referees, called offensive plays, and helped coach the defensive backs. *Id.* at 17:11–22. Coaches Eddie Lopez and Gary Posten assisted Defendant Bruck with coaching the JV football team. Pascone Am. Decl. Ex. 10 ("Lopez Dep.") 25:2–7, ECF 34-10; Bruck Dep. 29:22–30:10, 44:14–23. Defendant Bruck also helped coach the players on the JV team at the all-team practices led by Defendant Faateete. Bruck Dep. 17:2–10.

In 2016, Defendant Emery, an athletic trainer employed by Good Samaritan Hospital, served as Hermiston High School's athletic trainer. Pascone Am. Decl. Ex. 7 12:1–9, ECF 34-7. Among other duties, Defendant Emery was responsible for attending all football practices and home games and traveling to away games with the varsity football team. *Id*. 22:13–25. Defendant Emery was also responsible for documenting and treating athlete injuries, including concussions, making recommendations to parents about whether players with concussion injuries needed immediate medical treatment, and assisting student athletes with returning to play after an injury. *Id*. 48:1–7, 42:8–44:13.

On September 15, 2016, Hermiston High's JV team played a game against Mountain View High School in Bend, Oregon. Fry Decl. Ex. 1 at 89:25–90:12, ECF 16-1; Bruck Dep. 42:24–43:6; T. Martin Decl. ¶ 3, ECF 27. The parties disagree about what happened during that game. Plaintiffs allege that toward the end of the first quarter of the game, when C.M. was playing the position of outside linebacker on defense, he tried to block a fullback on the other team, and C.M. collided with the other player helmet-to-helmet, injuring C.M.'s head. C.M. Dep. 90:5–91:10. C.M. testified: "It was my job to pick up the block on the fullback. And when I was going to pick up that block, the fullback came in and let his head down to truck, and there was head-to-head contact there." *Id*. at 90:25–91:4. C.M. did not lose consciousness. *Id*. at 91:11–12. As a result of the head-to-head contact, Plaintiffs claim that C.M. suffered a mild concussion. *Id*. 90:5–7. It is undisputed that Coach Bruck put C.M. in the game in the position of wide receiver during the fourth quarter. T. Martin Decl. ¶ 5; Bruck Dep. 43:9–12.

C.M.'s father, Todd Martin, arrived at the September 2016 game during the second half and saw C.M. sitting on the sideline with his helmet off. *Id*. ¶ 4. Todd Martin motioned to C.M. to ask him why he was not playing and saw C.M. point to his head. *Id*. Two of the players on

C.M.'s team said that they did not see C.M.'s head injury, but they observed him afterward, and his behavior was strange. Ian Paradiso, a middle linebacker, said that C.M. went back into the game after his injury and was uncharacteristically slow and quiet, when he was usually fast and talkative. Paradiso Decl. ¶ 5, ECF 28. C.M. was supposed to line up next to Paradiso on the field, but he lined up on the wrong side of the line and was unsure what he was supposed to do. *Id.*; T. Martin Decl. ¶ 5–6. C.M. played like that throughout what Paradiso believes was the entire fourth quarter of the game. Paradiso Decl. ¶ 5.

Jesse Johnson, another player on C.M.'s team, injured his ankle early in the game and spent the rest of the first half in the locker room. Johnson Decl. ¶ 3, ECF 29. Johnson said he watched the second half of the game from the sideline and saw C.M. sitting on the bench with his helmet off, which was the usual practice for injured players. *Id.* ¶ 4. Johnson said that C.M. went back into the game when the coach ordered "first defense" to take the field. *Id.* ¶ 5. After the game, Johnson said that C.M. was sitting alone quietly, which was unusual because C.M. was usually very talkative. *Id.* ¶ 6. Johnson also said that it seemed to take C.M. thirty minutes to untie his shoes after the game. *Id.*

Defendants' version of the facts concerning the September 2016 game differs significantly from Plaintiffs' rendition. Defendants maintain that C.M. did not play linebacker during the first half of the game and remained on the sideline until the fourth quarter of the game. Defendant Bruck testified that C.M. played only a few plays during the fourth quarter in the position of wide receiver. Bruck Dep. 43:7–12. Defendant Bruck, Coach Lopez, and Coach Posten do not remember C.M. suffering an injury during the game. *Id.* at 43:7–9; Lopez Dep. 48:4–9; Pascone Am. Decl. Ex. 11 ("Posten Dep.") 29:22–30:10, ECF 34-11. Defendant Emery did not attend the September 2016 game because athletic trainers attended only the home games

of the JV team. Emery Dep. 22:24–23:2; 48:20–24. Defendants obtained a video of the September 2016 game from Mountain View High School, which Defendants argue establishes that C.M. did not play linebacker during the first half of the game. Def. Mot. Summ. J. ("Def. Mot.") 4, ECF 15; Fry Decl. Ex. 8, ECF 16-8. The video is just under twenty-six minutes long. Fry Decl. Ex. 8. The video footage does not run continually from the beginning of the game to the end. *Id*. Instead, the video consists of a series clips that begin at the start of a play and stop at the end of the play, even for plays that did not stop the game clock. *Id*. The video does not show substitutions, huddles, time-outs, or other events that occurred between plays and does not show the game clock. *Id*.

After the game, Mr. Martin asked Defendant Bruck if C.M. was okay, and Defendant Bruck said, "Yes." T. Martin Decl. ¶ 8. Defendant Bruck did not tell Mr. Martin that C.M. was injured during the game. *Id*. C.M. asked repeated questions and acted strangely during dinner and the long drive home. *Id*. ¶¶ 9–10. At one point, C.M. removed his clothes in the back seat during the drive home. *Id*. ¶ 10; C.M. Dep. 118:21–119:3.

When he returned home from the game, C.M. told his mother that he had taken a hit at the game and that someone had told C.M. that he had a concussion. D. Martin Decl. ¶ 4, ECF 26. C.M. told Mrs. Martin that C.M. needed to see Defendant Emery, his school's athletic trainer, the next day, on Friday, September 16, 2016. *Id*. C.M. tried to go to school on Friday, but he came home with a headache before the school day ended. *Id*. ¶ 5. Mrs. Martin drove C.M. back to the school after school ended so that C.M. could see Defendant Emery, and she waited in the car while C.M. saw Defendant Emery. *Id*.; C.M. Dep. 107:17–21. When he returned to the car, C.M. told Mrs. Martin that Defendant Emery had told C.M. that C.M. had a mild concussion. D. Martin Decl. ¶ 5. Defendant Emery instructed C.M. to rest over the weekend and return to see

Defendant Emery again on Monday. D. Martin Decl. ¶ 5; C.M. Dep. 107:19–21. Defendant

Emery has no recollection or record that he talked to C.M. on September 16, 2016. Emery Dep.

52:6–54:12.

C.M. went to school on Monday, September 19, 2016, four days after the game. When he

came home, C.M. told Mrs. Martin that C.M. had spoken with Defendant Emery after school,

and Defendant Emery had told C.M. that C.M. had passed the concussion tests and could return

to football practice. *Id.* ¶ 6. Defendant Emery has no recollection or record that he talked to C.M.

on September 19, 2016. Emery Dep. 52:6–54:12. Defendant Emery said that the first time he

heard about C.M.'s September 15, 2016 concussion was in January 2017 when Defendant Usher

asked Defendant Emery if C.M. had suffered a concussion at the game on September 15, 2016.

*Id.* at 52:6–19.

C.M.'s teammate Jesse Johnson said that during a game that took place between

September 15, 2016, and October 20, 2016, a player on their team received a head injury during

the game. Johnson Decl. ¶ 7. Coach Lopez told Johnson and other players not to tell Dan,

referring to Defendant Emery, about that player's head injury. *Id.* Mr. Johnson and other players

carried their injured teammate to the locker room at Coach Lopez's request. *Id.* Coach Lopez

asked C.M. if C.M. had told Defendant Emery about his head own injury. *Id.* ¶ 8. That exchange

occurred, according to Johnson, after the September 2016 game and before the October 20, 2016

game against Redmond. *Id.* ¶ 7.

C.M. played in several practices and games during the weeks between September 15,

2016, and October 20, 2016. C.M. Dep. 103:19–22, 104:10–12. At the home game against

Redmond on October 20, 2016, C.M. suffered another head injury. First Am. Compl. ("FAC") ¶

33, ECF 9. When the opposing team kicked off at the beginning of the third quarter, C.M. was

playing "bullet."[1] C.M. Dep. 102:11–17. While C.M. tried to tackle the player who returned the ball, a player on the other team hit C.M., and C.M. fell backward, hit his head on the turf, and lost consciousness. *Id*. Defendant Bruck described the hit as "a pretty nice shot that knocked him into the air, almost parallel to the ground, and then he hit the ground pretty hard." Bruck Dep. 51:15–19.

Defendant Emery evaluated C.M. for signs of a concussion on the sideline. C.M. Dep. 102:24–103:6. Defendant Emery did not know whether C.M. had lost consciousness as a result of the hit. Emery Dep. 56:8–22. Defendant Emery determined that C.M. likely had a concussion and kept C.M. out of play for the rest of the game. Emery Dep. 67:10–16. Defendant Emery told Mr. Martin after the game that C.M. was injured and provided Mr. Martin a handout that contained information about the symptoms of a concussion and included a warning to seek medical treatment if C.M.'s symptoms worsened. Emery Dep. 71:23–72:6, 95:16–96:13; Fry Decl. Ex. 5 at 54, ECF 16-5.

Defendant Emery completed an injury report that documented C.M.'s concussion and Defendant Emery's assessment. Fry Decl. Ex. 5 at 55. The injury report notes that other players told Emery that C.M. was acting weird. *Id*. Defendant Emery said that C.M.'s symptoms worsened over the next forty-five minutes and that C.M. was "released to [his] parent with instructions to monitor and see MD if symptoms worsened." *Id*. Defendant Emery's assessment was non-emergent signs and symptoms of a concussion. *Id*. Defendant Emery saw C.M. the following Monday, four days later, and C.M. reported a headache and photosensitivity. *Id*. Defendant Emery sent C.M. home with a note to his parents advising them that C.M. should stay

---

[1] C.M. explained in his deposition that the player who played "bullet" "ran full speed trying to hit the return man. It was your job to try and get there first, knock off any blockers you can." C.M. Dep. 87:6–12.

home from school until his symptoms subside and that C.M. should then see a doctor to progress

him back to full school days. *Id*.; Fry Decl. Ex. 5 at 56.

Defendant Emery did not perform repeat ImPACT testing on C.M. after his October 2016

head injury. Emery Dep. 40:10–14. In 2016, it was the responsibility of the team doctor, Dr.

Earl, to administer post-injury ImPACT testing. *Id*. at 40:10–25. No one instructed Plaintiffs to

see Dr. Earl or to have C.M. obtain a post-injury ImPACT test. D. Martin Decl. ¶ 17.

C.M. later returned to school on a reduced schedule, according to a school district form

called "Protocol Concussion/mTBI." Fry Decl. Ex. 10 at 1, ECF 16-10. The form notes that the

date of C.M.'s head injury was October 20, 2016, and recommends that C.M. should attend only

two class periods per day with accommodations. *Id*. The accommodations included limiting

C.M.'s computer time, allowing C.M. to wear a hood, hat, or sunglasses during class, excusing

him from testing and complex assignments, and allowing him extra time to complete

assignments. *Id*. at 1–2. The form limited C.M.'s physical activity to fifteen minutes of stationary

biking per day as tolerated and excluded C.M. from sports, PE, and open gym. *Id*.

Plaintiffs allege that as a result of his injuries, C.M. suffers from severe anxiety and

depression, memory loss, diminished cognitive functioning, and headaches, and he has tried to

commit suicide four times. T. Martin Decl. ¶¶ 20–22; D. Martin Decl. ¶¶ 21–27. Plaintiffs allege

that they no longer have the emotional and physical relationship they had with C.M. before his

injury and that their relationship now focuses on trying to get him to eat and prevent further

suicide attempts. T. Martin Decl. ¶ 28; D. Martin Decl. ¶¶ 22, 28.

Dr. Earl began treating C.M. on November 7, 2016. Earl Decl. ¶ 5, ECF 30. Dr. Earl

opined that C.M. "did not adequately clear from a first concussion at the Mountain View game in

September, and [] the October 20, 2016 injury against Redmond resulted in a significant and

severe extension of that initial concussion." *Id.* ¶ 6. Dr. Earl attributes C.M.'s difficulties with anxiety and depression to his brain injury. *Id.* ¶ 7.

## EVIDENTIARY OBJECTIONS

Plaintiffs object to Exhibits 8 and 9 to the declaration of Blake Fry, Defendants' counsel. Exhibit 8 is a video of the September 15, 2016, game against Mountain View, and Exhibit 9 is a summary of the video prepared by Defendants' counsel. Fry Decl. ¶¶ 9–10, ECF 16. Plaintiffs argue that Exhibit 8 is inadmissible because it is not authenticated and is unreliable because it is inaccurate. Plaintiffs also argue that the video is inadmissible hearsay because it is offered to prove the truth of the matter asserted, that C.M. was not injured during the game. Plaintiffs do not dispute that the video shows at least some plays of the September 15, 2016 game.

Defendants filed a declaration of Defendant Bruck with their reply to their motion for summary judgment that attests that the video is a fair and accurate representation of the September 15, 2016, game. Bruck Decl. ¶¶ 2–4, ECF 33. The Court declines to consider Defendant Bruck's declaration because Defendants submitted it for the first time in their reply, could have filed it with their motion, and Plaintiffs did not have a chance to respond. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (When "'new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without first giving the [non-]movant an opportunity to respond.'") (quoting *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990)).

Plaintiffs' objections to Exhibit 8 are overruled. The video does not include inadmissible hearsay. Plaintiffs do not dispute that the video accurately represents the plays that it recorded. Thus, the video is admissible. Whether or not it shows every play of the game is a separate question that does not render the video inadmissible.

Exhibit 9 is a summary of the contents of Exhibit 8 prepared by Defendants' counsel. It explains where Defendants believe C.M. stood or played during most of the plays shown on the video. Fry Decl. Ex. 9, ECF 16-9. Plaintiffs object to Exhibit 9 and argue that its admissibility depends on the admissibility of the video, which Plaintiffs argue is inadmissible hearsay. Plaintiffs' objection to Exhibit 9 is overruled. Exhibit 9 is admissible under Fed. R. Evid. 1006 to summarize the content of the video.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *F.T.C. v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108,

1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

Defendants move for summary judgment on Plaintiffs' Fourteenth Amendment due process claims under 42 U.S.C. § 1983 and C.M.'s negligence claims. Plaintiffs' claims are based on Defendants' decision to return C.M. to practice and play after his September 15, 2016 injury without medical clearance while he continued to experience symptoms of a concussion, which led to his injury during the October 20, 2016 football game.

## I.    Section 1983 Claims

Defendant moves to dismiss Plaintiffs' § 1983 claims based on Fourteenth Amendment substantive due process violations. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

42 U.S.C. § 1983.

To prove a claim under § 1983, a plaintiff must establish both (1) the deprivation of a right secured by the United States Constitution or statutory law, and (2) that a person acting under color of state law committed the deprivation. *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). Defendants agree that they were acting under color of state law. They argue that Plaintiffs failed as a matter of law to establish that they suffered a constitutional violation. Plaintiffs respond that they have produced evidence enough to create a genuine issue of material fact about whether Defendants violated their substantive due process rights under the Fourteenth Amendment.

### A.    C.M.'s Substantive Due Process Claim

C.M. argues that Defendants' conduct violated his fundamental right to bodily autonomy protected by the Fourteenth Amendment's Due Process Clause when they returned C.M. to practice and play after his September 2016 concussion without medical clearance. The Due Process Clause provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment, both in its substantive and procedural aspects, protects individuals from arbitrary government action. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]'" *Id*. at 846 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). The Due Process Clause "does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Id*. at 848.

To establish a Due Process violation, Plaintiffs must show that an official's actions "shocks the conscience" and violates the "decencies of civilized conduct," *id*. (internal quotation marks omitted), or "interferes with the rights implicit in the concept of ordered liberty." *United*

*States v. Salerno*, 481 U.S. 739, 746 (1987) (internal quotation marks and citations omitted).

Rights implicit in the concept of ordered liberty include fundamental rights. *See Reno v. Flores*, 507 U.S. 292, 302 (1993) (describing substantive due process as the substantive component of Fourteenth Amendment due process that forbids the government from infringing on fundamental rights); *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1154 (9th Cir. 2016). If the government action did not implicate any fundamental rights, then C.M. cannot sustain a substantive due process claim. *C.R.*, 835 F.3d at 1154.

The Supreme Court has held that the right to bodily autonomy is a fundamental right protected by substantive due process. *See, e.g., Lawrence v. Texas*, 539 U.S. 558, 564 (2003); *C.R.*, 835 F.3d at 1154. The fundamental right to bodily autonomy includes the right to be free from physical injury, bodily restraint, and bodily intrusions. *See, e.g.*, *Ingraham v. Wright*, 430 U.S. 651, 673 (1977) (physical restraint); *Rochin v. California*, 342 U.S. 165, 172 (1952) (forced stomach pumping); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (physical injury); *Wood v. Ostrander*, 879 F.2d 583, 586, 589 (9th Cir. 1989) (personal security and safety). It also includes the right to be free from the infliction of unnecessary pain. *See, e.g., Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 794 (11th Cir. 1987).

> i.    The state-created danger exception

Defendants argue that no genuine issue of material fact remains that C.M. did not suffer a concussion in the September 2016 football game because he played during only a few plays at the end of the game and was not injured during those plays. Alternatively, Defendants argue that Plaintiffs failed establish that Defendants acted (1) affirmatively, and (2) with deliberate indifference to a known or obvious danger that C.M. could be seriously injured when Defendants

put him into play in the October 2016 game without first receiving medical clearance. The Court addresses each of the required elements of the state-created danger exception in turn.

In general states are not liable for omissions under the Fourteenth Amendment. *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). A state's omission or failure to act may give rise to a § 1983 claim "when the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger.'" *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011) (quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1966)). C.M.'s Fourteenth Amendment claim is based on Plaintiffs' argument that Defendants acted with deliberate indifference to the known or obvious danger that C.M. could be seriously injured when Defendants returned C.M. to practice and play following his September 2016 concussion without medical clearance and while he still had concussion symptoms.

a.    Affirmative act

For the state-created danger exception to apply, Plaintiffs must establish that Defendants affirmatively placed C.M. in danger. Plaintiffs can demonstrate an affirmative act by showing that Defendants had "roles in creating or exposing individuals to danger they otherwise would not have faced." *See Kennedy*, 439 F.3d at 1062–63 (holding that the plaintiff demonstrated an affirmative act by showing that officer had informed the perpetrator of a sexual assault about the victim's allegations without giving the victim's family notice and a chance to protect the victim from the perpetrator's violent response); *Munger*, 227 F.3d at 1086 (holding relevant question is whether Defendants "left the person in a situation that was more dangerous than the one in which they found him."); *Grubbs*, 974 F.2d at 121 (holding that staff at a correctional institution acted affirmatively when they created an opportunity for an inmate with a history of "unrepentant

violence against women and girls" to assault a female employee by leaving her alone with the inmate).

Defendants argue that allowing C.M. to practice and play in football games is a form of inaction, not action, and the state-created danger exception does not apply. Def. Mot. 12. Defendants' argument fails to consider the role that football coaches play during a football game. In a football game, coaches direct the players and their involvement in the game. They decide when players take the field, what position the players play, and how long they play. In the October 2016 game, Defendant Bruck decided which offensive plays his team would run and which players would be on the field during each of those plays. C.M. Dep. 87:18–24; Bruck Dep. 44:11–20. Coach Posten ran the defense during the game. Bruck Dep. 44:21–23. It was not up to C.M. whether and to what extent he participated in the plays of the game as opposed to standing on the sideline; that decision was Defendant Bruck's and C.M.'s other coaches' decision to make. C.M.'s coaches called the plays, substituted C.M. onto the field from the sideline, decided what position(s) C.M. would play, and how much time C.M. would play in the game. By putting C.M. into the field of play, rather than leaving him on the sideline, Defendants affirmatively placed C.M. in a position of greater danger than he was in while he stood on the sideline. Thus, C.M.'s coaches acted affirmatively when they put him on the field. *See Hernandez v. City of San Jose*, 897 F.3d 1125, 1133–34 (9th Cir. 2018) (plaintiffs sufficiently alleged an affirmative act by alleging that defendant officers directed rally attendees out of a single venue exit into a crowd of violent anti-Trump protesters); *R.H. v. Los Gatos Union Sch. Dist.*, No. 5:11-cv-03729-LHK, 2012 WL 4068674, at *5 (N.D. Cal. Sept. 14, 2012) (wrestling coaches acted affirmatively when they put a student in a match against an opponent who was heavier and more experienced than the student); *see also Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997)

("The critical distinction is not . . . between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk."); *see also Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) (holding state facility acted affirmatively when it released a schizophrenic man who murdered someone one year later because "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."). As a result, Plaintiffs produced sufficient evidence to put the question of whether Defendants affirmatively placed C.M. in danger to a jury.

b.    Deliberate indifference

The question remains whether Defendants acted with deliberate indifference to a known or obvious danger when they put C.M. into play in the October 2016 game. Defendants argue that they did not act with deliberate indifference to a known or obvious danger because (1) C.M. was not injured in the September 2016 game, or (2) Defendants did not knowingly put C.M. in danger by putting him into play in the October 2016 game because they did not know that C.M. was injured in the September 2016 game. Thus, Defendants argue, there was no known or obvious risk of putting C.M. into practice and play in the October 2016 game. Questions of material fact remain on both issues.

1.    Whether C.M. was injured during the September 2016 game

Defendants rely on the video of the September 2016 football game to establish that C.M. did not play linebacker during the game and was not injured in the game. Def. Mot. 4–6, 10. Video footage does not eliminate all questions of fact. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that on summary judgment, when the facts are captured on video, courts should view the facts "in the light depicted in the videotape."); *Vos v. City of Newport Beach*, 892 F.3d

1024, 1028 (9th Cir. 2018) ("The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage."). The Court finds that the video of the September 2016 game does not resolve the questions of fact raised by Plaintiffs concerning whether C.M. played linebacker during the first half of the game.

Defendants assert, and Plaintiffs do not dispute, that C.M. was wearing a jersey bearing the number twenty during the September 2016 game. But the video does not conclusively establish that no player wearing the number twenty played during the first half of the game. First, nothing in the record aside from counsel's assertions establishes which of the two teams was C.M.'s team. Second, the video consists of a series of clips showing various plays, but it does not show what happened between plays, such as substitutions and time-outs. Fry Decl. Ex. 8. The video is fewer than twenty-six minutes long. *Id*. The National Federation of State High School Associations' 2016 high school football rule book provides that games had a running time of forty-eight minutes. *Id*.; Estacio-Heilich Decl. Ex 1, Rule 3, Art. 1, ECF 25-1. Because the video does not show the game clock or anything that occurred after plays that did not stop the game clock, the Court cannot determine whether it shows every play of the game. It is undisputed that Jesse Johnson and another player, C.W., also sustained injuries during the September 2016 game, but the video does not show their injuries. C.M. Dep. 114:5–17; Johnson Decl. ¶ 3; Bruck Dep. 43:2–6. C.W.'s injury caused a significant delay in the game and led to his transport from the game in an ambulance, which is not apparent from the Court's review of the video. C.M. Dep. 114:12–15, 120:20–23; Fry Decl. Ex. 4 at 43:2–6, ECF 16-4.

Defendants' counsel summarized the plays shown on the video of the September 2016 game. Fry Decl. ¶ 10; Fry Decl. Ex. 9. The declaration of Defendants' counsel does not establish

that the video includes every play of the September 2016 game. It simply notes that the summary includes "various information for each play shown on the video of the September 15, 2016 game." *Id*. There is no evidence elsewhere in the record establishing that the video shows every play of the September 2016 game.

Although Defendants argue that the summary shows that the video recorded every play of the game, the Court cannot determine the accuracy of the summary based on its review of the video. Fry Decl. Exs. 8, 9. Plaintiffs submitted a competing declaration of counsel that identifies several seconds of the video in which the screen is blank. Estacio-Heilich Decl. ¶ 12. In addition, the summary of the video prepared by Defendants' counsel identifies the jersey numbers of three linebackers on the field during the plays in which C.M.'s team was on defense, but counsel's summary is not evidence. It is a summary of evidence. No evidence in the record establishes that only three linebackers were on the field during each of Hermiston's defensive plays and that none of those plays used a fourth linebacker. In addition, evidence in the record establishes that it was not unusual for players to line up in the wrong place on the field during some of the team's plays.[2]

The Court cannot discern from its review of the video where C.M. was during the plays of the game included on the video. During several plays, the jersey numbers of several players on the field and sideline are not visible or only partially visible. As a result, the video does not

---

[2] Defendant Bruck testified that "[t]here are some players [who] never remember a play to save their life. So, it wouldn't be uncommon for them to get a couple plays wrong in a row." Bruck Dep. 61:21–23. Defendant Bruck could not remember whether C.M. was one of those players: "I remember [C.M.] not being somebody that saw the field very much. Other than that, I don't remember." *Id*. 62:5–9.

eliminate the question of fact raised by Plaintiffs that C.M. was injured while playing linebacker in the first half of the September 2016 game.[3]

> 2. Whether Defendants knew that C.M. was injured in the September 2016 game

Plaintiffs produced evidence from several witnesses to establish a dispute of fact concerning whether Defendants knew that C.M. had injured his head in the September 2016 game. C.M. testified that he told Defendant Emery that he had received a head injury during the September 15, 2016, game the next day on September 16, 2016. C.M. Dep. 107:1–21, 121:24–122:18. Plaintiff Dawna Martin attested that she drove C.M. to school on Friday, September 16, 2016, to see Defendant Emery and waited in the car while C.M. visited with Defendant Emery about C.M.'s concussion. D. Martin Decl. ¶ 5. After seeing Defendant Emery, C.M. told Mrs. Martin that Defendant Emery had told C.M. that C.M. had a concussion and that C.M. should rest over the weekend and return to see Defendant Emery the following Monday. *Id.* C.M. testified that he returned to see Defendant Emery the following Monday on September 19, 2016, and Defendant Emery told C.M. that C.M. could return to play after performing concussion testing on C.M. *Id.* at 123:4–18. Although Defendants produced conflicting evidence from Coach Lopez, Defendant Bruck, and Defendant Emery, who testified that they did not remember seeing C.M.'s head injury during the game or remember C.M. telling them about it later, resolving that conflict in the evidence is a task for the jury, not the Court.

---

[3] Defendants begin each of their remaining arguments by restating their position that no constitutional violation—or negligence—occurred because C.M. was not injured during the September 2016 game. Because the Court has concluded that a question of fact remains about whether C.M. was injured in the September 2016 game, the Court does not restate that finding throughout the remainder of this decision when Defendants base their other arguments on their position that C.M. was not injured during the September 2016 game.

C.M. testified that during practices between the September and October 2016 games, C.M. told Defendant Bruck that he continued to have headaches. *Id*. at 126:22–127:8, 129:9–14. C.M. estimated that he told Defendant Bruck that he was experiencing headaches two or three times between the September and October 2016 games. *Id*. at 129:15–17. Defendant Bruck told C.M. to return to see Defendant Emery if his headaches worsened. *Id*. C.M. testified that his headaches continued, but did not worsen, so he did not return to see Defendant Emery because he understood from Defendant Bruck that he needed to return to see Defendant Emery only if his headaches worsened. *Id*. at 127:6–12.

Evidence in the record establishes that between the September and October 2016 games, Coach Lopez told C.M.'s teammates not to tell Defendant Emery about another player's concussion and that Coach Lopez returned that player to play later in the same game. C.M. Dep. 78:8–79:8; Johnson Decl. ¶ 7. Coach Lopez asked C.M. whether C.M. had told Defendant Emery about C.M.'s head injury. Johnson Decl. ¶ 8.

Defendants also argue that "the fact that [C.M.] continued to practice and play for five weeks" after that game without incident demonstrates their lack of knowledge that C.M. had received a head injury in the September game. Def. Mot. 13. However, Plaintiffs offered evidence to the contrary. Plaintiffs produced evidence that during those five weeks C.M. complained to his coaches that he continued to experience headaches as a result of his September 2016 concussion. C.M. Dep. 129:13–17. When viewed in the light most favorable to Plaintiffs, the evidence establishes a question of fact about whether Defendants Bruck and Emery knew that C.M. had suffered a concussion during the September 2016 game and, with that knowledge, returned C.M. to play without medical clearance.

///

3.  Whether Defendants disregarded a known or obvious danger when they put him into play during the October 2016 game

There is no dispute that Defendants put C.M. into play in the October 2016 game and that C.M. suffered a head injury during that game. Because a reasonable juror could conclude from the evidence that Defendants knew that C.M. had suffered a head injury during the September 2016 game and knew that C.M. continued to experience concussion symptoms after the September 2016 game, the Court must now determine whether Defendants acted with deliberate indifference to a known or obvious danger when they put C.M. into play during the October 2016 game with that knowledge.

"Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Patel*, 648 F.3d at 974 (quoting *Bryan Cnty. v. Brown,* 520 U.S. 397, 410 (1997)). "The affirmative act must create an actual, particularized danger, and the ultimate injury to [the plaintiff] must be foreseeable." *Hernandez*, 897 F.3d at 1133 (internal citations omitted). The standard for deliberate indifference is higher than ordinary negligence; it requires a culpable mental state. *Id*. To establish deliberate indifference, a plaintiff must show that the defendant "recognize[d] the unreasonable risk and actually intend[ed] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Grubbs*, 92 F.3d at 899 (internal quotation marks and brackets omitted). If a reasonable juror could conclude that the defendant acted with deliberate indifference, then the question must be left for a jury to decide. *Patel*, 648 F.3d at 974.

Defendants argue that because they did not know that C.M. would suffer a new concussion or suffer an exacerbation of his existing concussion if they put him into the October 2016 game, Plaintiffs cannot show deliberate indifference. Def. Mot. 10. That argument misstates the standard. Plaintiffs need not prove that Defendants knew the exact type of injury

that C.M. may suffer when they put him into the game. Plaintiffs simply need to show that there was a known or obvious risk of harm and that Defendants knew that they would expose C.M. to that risk when Defendants put him into the game. *See Hernandez*, 897 F.3d at 1133 (the standard is whether the defendants "left the person in a situation that was more dangerous than the one in which they found him") (quoting *Munger*, 227 F.3d at 1086); *Wood*, 879 F.2d at 588, 590 (the plaintiff raised a genuine issue of fact regarding deliberate indifference by showing that officer left the plaintiff on the side of the road at night in a high-crime area where she was later raped in part because the "the inherent danger facing a woman left alone at night in an unsafe area [was] a matter of common sense.").

Here, the risk at issue was the risk that C.M. could suffer a serious head or brain injury when his coaches returned him to practice and play before C.M. received medical clearance to play following his first concussion while he continued to have concussion symptoms. Defendant Bruck, Defendant Faateete, and Coach Lopez knew or should have known of that risk because it was a topic covered in their annual concussion training. Fry Decl. Ex. 4 at 24; Fry Decl. Ex. 4 at 59:16–62:4; Lopez Dep. 26:20–23 Usher Dep. 35:5–15. Defendant Emery knew or should have known of that risk based on his knowledge about and experience treating student athletes' concussions. Emery Dep. 12:14–18 (noting that he has a certification from ImPACT to assess concussions). That risk, even if it was unknown to Defendants, was obvious, foreseeable, and a matter of common sense. Concussions and other head injuries are common in football. There was little risk that C.M. would suffer an injury from the sideline, but that risk sharply increased when Defendants took him off the sideline and put him into play in the October 2016 game. Defendants put C.M. into the game in the position of bullet, where he was supposed to run "full speed trying to hit the return man." C.M. Dep. 87:6–12. It was obvious that while trying to hit

another player, C.M. could suffer a head injury. By putting C.M. into play in the October 2016 game, Defendants placed him "in a situation that was more dangerous than the one in which they found him" on the sideline. *Munger*, 227 F.3d at 1086; *Hernandez*, 897 F.3d at 1133.

In addition, Oregon law required schools to ensure that no coach returns a student athlete to practice and play without medical clearance after the athlete exhibits signs of a concussion. Or. Rev. Stat. § ("O.R.S.") 335.485; *former* Or. Admin. R. ("O.A.R.") 581-022-0421 (2015). Defendants should have been able to deduce, if they did not know, that the reason they needed to keep players who exhibit signs of a concussion out of practice and play was to prevent the risk of further injury. A reasonable juror could conclude that Defendants in fact knew about that risk based on the evidence that Coach Lopez told players on C.M.'s team not to tell Defendant Emery about E.K.'s head injury and that the coaches had returned E.K. to play later in the same game with that injury. Plaintiffs thus have produced enough evidence to present the question of Defendants' deliberate indifference to a jury.

> c.  Whether Defendants' conduct rose to the level of a constitutional violation

Defendants argue that even if Plaintiffs establish a question of fact that Defendants acted with deliberate indifference to a known or obvious danger by returning C.M. to play football, Defendants' conduct was not egregious enough to amount to a constitutional violation. "The ultimate inquiry in any substantive due process case is whether the 'behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Morgan v. Bend-La Pine Sch. Dist.*, No. CV-07-173-ST, 2009 WL 312423, at \*11 (D. Or. Feb. 6, 2009) (quoting *Lewis*, 523 U.S. at 847). To determine whether Defendants' conduct shocks the conscience, the court must "look objectively at the specific circumstances of the school and

child." *Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1181 (9th Cir. 2007).

Deliberate indifference may rise to the conscience-shocking level when the government official

had time to deliberate before acting or failing to act. *Lemire v. Cal. Dep't of Corr. and Rehab.*,

726 F.3d 1062, 1075 (9th Cir. 2013) (quotation marks omitted) (holding that prison official's

conduct usually will meet that standard if the conduct was deliberately indifferent).

Plaintiffs produced enough evidence to put the question of whether Defendants'

deliberate indifference shocked the conscience to a jury. The relevant circumstances, when

viewed in the light most favorable to Plaintiffs, are that C.M. was a fifteen-year-old boy playing

his first season of football on a high school football team. C.M. suffered a concussion in the

September 2016 football game, and the school's athletic trainer told C.M. that he could return to

play. C.M.'s coaches, with knowledge that he continued to experience concussion symptoms,

then put C.M. onto the field of play during a game in the position of "bullet" when a doctor had

not released C.M. to play. During that game, C.M. suffered a second concussion that caused a

serious injury. Based on the record, a reasonable factfinder could conclude that Defendants'

conduct shocked the conscience when they returned C.M. to practice and play, particularly

because C.M.'s coach put him into play in a position where his job was to hit other players while

he had lingering concussion symptoms. As a result, Plaintiffs have raised genuine issues of

material fact that preclude summary judgment on C.M.'s § 1983 claim.

### B.    Plaintiffs Todd and Dawna Martin's Substantive Due Process Claims

The basis of Plaintiffs Todd and Dawna Martin's § 1983 claims is their allegation that

Defendants violated their Fourteenth Amendment fundamental right to a familial relationship

with C.M. by causing C.M.'s October 2016 injury. Plaintiffs allege that Defendants deprived

them of their right to a familial relationship with C.M. by permanently injuring him in a way that

fundamentally altered their relationship with him. FAC ¶ 68. In their motion for summary

judgment, Defendants argue that Plaintiffs Todd and Dawna Martin's Fourteenth Amendment claim fails for the same reasons that it argues that C.M.'s Fourteenth Amendment claim fails: (1) because C.M. was not injured in the September 2016 game,[4] and (2) if C.M. was injured in the September 2016 game, putting him in the October 2016 game was merely negligent and did not shock the conscience. Defendants also argue that Fourteenth Amendment due process only protects parents from termination of their parental association with a child, not from conduct that merely affects the parent-child relationship. Def. Mot. 14–15.

A parent has a fundamental right under the Fourteenth Amendment to a familial relationship with their child. *Smith v. City of Fontana*, 818 F.2d 1411, 1418–19 (9th Cir. 1987), *abrogated on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1043–44 (9th Cir. 1999)). That right includes a right to the "companionship and society" of the child. *Id*. A government official cannot deprive a parent of the right to a familial relationship with their child in a manner that "shocks the conscience." *Leontiev v. Corbett Sch. Dist.*, 333 F. Supp. 3d 1054, 1064–65 (D. Or. 2018). Deprivation of the right to a familial association need not be permanent or total to maintain a § 1983 claim for loss of companionship and society. *Doe v. Dickenson*, 615 F. Supp. 2d 1002, 1014 (D. Ariz. 2009) (citing *Moore v. City of East Cleveland*, 431 U.S. 494, 504–06 (1977) and *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925)).

Supreme Court and Ninth Circuit precedent do not explain the degree to which a defendant must interfere with the familial relationship between a parent and child to rise to the level of a constitutional violation. However, several district courts have found that the degree of state interference must effectively terminate the parent-child relationship for some time period to

---

[4] The Court has already determined that a question of fact remains concerning whether C.M. was injured during the September 2016 game. *See* Section I(A)(i)(b)(1), *supra*.

violate the Fourteenth Amendment. For example, in *Harry A. v. Duncan*, a district court found

that although the school's conduct may have placed "tremendous stress on these families and

their relationships" with their children and "weakened the closeness of the parent-child

relationship," that conduct was insufficient to maintain a § 1983 claim for a Fourteenth

Amendment violation against the school. 351 F. Supp. 2d 1060, 1068 (D. Mont. 2005) (noting

that the constitution does not protect parents from state action that "has the ultimate effect of

disturbing the tranquility of the parent-child relationship"). Other district courts have reached

similar conclusions. *See, e.g., Leontiev*, 333 F. Supp. 3d at 1065–66 (school district did not

violate a parent's right to a familial relationship with their child by providing advice and support

to the child and offering the child a place to live after the child's parent kicked the child out of

the parent's home).

      The cases in which courts have found that state action interfered with the parent-child

relationship to a degree that amounted to a Fourteenth Amendment violation involved a greater

degree of interference with the parent-child relationship than was present in *Harry A.* and

*Leontiev*. Several courts have found that the state must nearly terminate the parent-child

relationship to violate the Fourteenth Amendment. *See Morrison v. Jones*, 607 F.2d 1269, 1275

(9th Cir. 1979) (parent sufficiently alleged a § 1983 claim based on a Fourteenth Amendment

violation by alleging that the defendants' actions resulted in her mentally ill child's deportation

to Germany); *Rabinovitz v. City of L.A.*, 287 F. Supp. 3d 933, 950 (C.D. Cal. 2018) (holding that

"it appears that such rights are recognized primarily in the context of removal of parental

custody, parental status determinations, or death"); *E.H. v. Brentwood Union Sch. Dist.*, No.

C13-3243 TEH, 2013 WL 5978008, at *2 (N.D. Cal. Nov. 4, 2013) (quoting *Kelson v. City of

Springfield*, 767 F.2d 651, 654–55 (9th Cir. 1985), *overruled on other grounds by Daniels v.

*Williams*, 474 U.S. 327 (1986)) ("Although the Ninth Circuit has recognized a Fourteenth Amendment 'due process' right flowing from the parent-child relationship, such a right is only considered impaired in situations such as the death of a child, loss of parental rights, or the loss of contact or custody with the child."); *Harry A.*, 351 F. Supp. 2d at 1068 (*Kelson v. City of Springfield* "and the cases it cites establish[] the existence of a constitutionally protected right to be free from termination of the parent-child relationship or from governmental interference with the parent-child relationship so intrusive as to be the equivalent of termination of that relationship"); *Benitez v. Gresham-Barlow Sch. Dist.*, No. 3:12-CV-1003-ST, 2012 WL 3878419, at *4 (D. Or. Sept. 6, 2012) (holding that allegations of "estrangement from their daughter, severe emotional injury . . . and permanent familial damage" were insufficient for parents to state a § 1983 claim based on a Fourteenth Amendment violation).

Another district court in this circuit reached the opposite conclusion. In *Dickenson*, the court denied summary judgment to a police officer who worked as a school resource officer and had molested a child multiple times at school. 615 F. Supp. 2d at 1004–05. The evidence about the effect on the parent-child relationship included evidence that the child had been "required to undergo therapy, that he is 'never going to be normal' again, and that [the plaintiff parent] continue[d] to suffer emotional pain as a result." *Id*. at 1014. On those facts, the court held that "a reasonable jury could conclude that [the plaintiff] has suffered at least some loss of her son's society and companionship" and found that summary judgment on that claim was inappropriate. *Id*. In doing so, the district court rejected the defendant's arguments that the parent's constitutional injury was "neither 'permanent' nor 'total,'" and noted that the degree of the interference with the parent's loss of society and companionship was a question of damages, not liability. *Id*.

Plaintiffs base their argument that Defendants' actions deprived them of their right to the society and companionship of C.M. primarily on *Ovando v. City of L.A.*, 92 F. Supp. 2d 1011 (C.D. Cal. 2000). In *Ovando*, an officer had shot the child's parent in the head, and the parent's injuries led to severe cognitive impairment. *Id*. at 1015. The district court found on those facts that "an injury which placed a parent into a coma or a 'vegetative' state" was cognizable as a § 1983 claim but cautioned that "not all injuries create a loss of companionship." *Id*. at 1020. The court recognized that "whether there has been an interference with, or deprivation of, this right may turn on the degree to which the parent has suffered impairment at the hands of the state." *Id*. at 1021. The turning point, according to the *Ovando* court, was whether the mental impairment prevented the child "from maintaining an 'emotionally enriching' tie" to the parent. *Id*. at 1021.

The Court is persuaded by the *Dickenson* and *Ovando* courts and finds that Plaintiffs have produced sufficient evidence that C.M.'s injuries have interfered with their right to the society and companionship of C.M. Plaintiffs allege that as a result of his injuries, C.M. suffers from significant depression, anxiety, and memory problems. Plaintiffs stated that C.M. "is shut down and withdrawn. The days of spontaneous hugs are over. He has physically withdrawn from me, Todd, and his siblings. There are times [he] doesn't like to be touched, and says it hurts." D. Martin Decl. ¶ 21. Plaintiffs attested that they no longer "have the emotional contact and conversations with him that were a large part of [their] relationship" before his injuries. *Id*. ¶ 22; T. Martin Decl. ¶ 21. Instead, C.M. "shuts himself away for days and sometimes weeks at a time. When it is particularly bad, [Plaintiffs] must bring him food in bed, make efforts to get him to eat, and stay with him while he eats. He won't talk at all on days [when his] depression and anxiety are bad." D. Martin Decl. ¶ 22. Plaintiffs allege that C.M. has attempted suicide four times as a result of his injuries. *Id*. ¶ 26; T. Martin Decl. ¶ 25. Plaintiff Dawna Martin stated that

C.M. "is physically present, but [he is] not the same person he was. I feel like I have lost that person and the relationship we once had." D. Martin Decl. ¶ 29. C.M.'s father stated that his relationship with C.M. has been reduced to "simply trying to keep him alive." T. Martin Decl. ¶ 28.

The interference with the society and companionship of C.M. described by Plaintiffs is similar to the interference between the parent and child in *Dickenson*. Like the child in *Dickenson*, C.M. has suffered a psychological injury as a result of his concussion that interferes with his society and companionship with his parents and causes them ongoing emotional pain. C.M.'s injury has prevented Plaintiffs from maintaining an emotionally enriching tie with C.M. *See Ovando*, 92 F. Supp. 2d at 1021 (holding that the plaintiff established a Fourteenth Amendment violation by demonstrating that the parent had suffered an injury that prevented the child from maintaining an emotionally enriching relationship with their parent). To what degree that injury interferes with C.M.'s society and companionship with Plaintiffs Todd and Dawna Martin is a question of damages that a jury should decide. *Dickenson*, 615 F. Supp. 2d at 1014.

### C.    Individual Defendants' Causation

Defendants Usher, Emery, Faateete, and Bruck ("Individual Defendants"), who Plaintiffs sue in their individual capacities, argue that Plaintiffs have failed to establish that they caused the constitutional violations that Plaintiffs allege because they did not personally participate in the constitutional violation. Plaintiffs argue that enough evidence exists to put the question of causation to a jury.

A person deprives another of a constitutional right "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the [constitutional] deprivation.'" *Preschooler II*, 479

F.3d at 1183 (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1988)). "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Id*. (quoting *Johnson*, 588 F.2d at 743). Causation also may be established when an official "'knowingly refuse[s] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury.'" *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2001) (quoting *Dubner v. City and Cnty. of S.F.*, 266 F.3d 959, 968 (9th Cir. 2001)). The causation analysis in a § 1983 case "closely resembles the standard 'foreseeability' formulation of proximate cause." *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). Analyzing an individual defendant's participation in the constitutional violation requires the court to "take a very individualized approach which accounts for the duties, discretion, and means of each defendant." *Leer v. Murphy*, 844 F.2d 628, 633–34 (9th Cir. 1988) *impliedly overruled on other grounds as recognized in Gates v. Jackson*, No. CV 14-904 DDP(JC), 2014 WL 12851952, at *4 (C.D. Cal. Aug. 7, 2014).

The Court addresses Plaintiffs' claims against the Individual Defendants in turn.

i.      Defendants Bruck and Emery

Defendant Bruck, C.M.'s football coach, and Defendant Emery, the school's athletic trainer, argue that they are entitled to summary judgment on Plaintiffs' § 1983 claims because they did not cause Plaintiffs' constitutional violations. First, they argue that they could not have individually participated in causing a constitutional violation that did not occur. As the Court has already discussed, there is a question of fact concerning whether a constitutional violation occurred. There is also ample evidence in the record that they individually participated in the constitutional harm. Evidence in the record establishes that Defendant Emery told C.M. after

C.M.'s September 2016 injury that C.M. had a concussion and later told C.M. that he could

return to play without requiring C.M. to obtain medical clearance. There is also evidence that

C.M. told Defendant Bruck that C.M. had been injured in the September 2016 game, that C.M.

continued to experience headaches, and that Defendant Bruck told C.M. to see Defendant Emery

if his headaches worsened, but allowed him to practice and put him into play in the October 2016

game anyway.

Those facts, when viewed in the light most favorable to Plaintiffs, establish that both

Defendant Bruck and Defendant Emery, at a minimum, set in motion a series of acts by others

that they knew or reasonably should have known would cause C.M.'s constitutional injury. By

telling C.M. that he could return to practice and play after his September 2016 injury, Defendant

Emery knew or should have known that Defendant Bruck would expose him to plays and

positions on the field that could cause C.M. to suffer a second head injury before he had healed

from his first injury. Given his education and training, Defendant Emery knew or should have

known that C.M. could be seriously injured if he received another concussion before he healed

from his first concussion. Similarly, by continuing to keep C.M. in practice and play and telling

C.M. to follow up with Defendant Emery if his symptoms worsened—rather than immediately—

Defendant Bruck knew or should have known that C.M. was still experiencing concussion

symptoms after the September 2016 game and that C.M. could suffer another injury. As a result,

there is enough evidence of Defendants Bruck and Emery's individual participation in the

alleged constitutional violation to put the question of causation to the jury.

ii.      Defendants Faateete and Usher

State officials are not vicariously liable for the actions of their subordinates. *Monell v.*

*Dep't Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). A supervisor is liable under § 1983

only "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 798 (9th Cir. 2018). To make that showing, Plaintiffs must establish the supervisor's "'own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.'" *Keates v. Koile*, 883 F.3d 1228, 1243 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)).

Defendants Faateete and Usher argue that they are not liable to Plaintiffs on a supervisory theory and they did not personally participate in any constitutional violation. Defendants Faateete and Usher argue that there is no evidence that they knew about the constitutional violations committed by Defendants Bruck and Emery, acquiesced in those violations, or were indifferent to them. Plaintiffs argue that because Defendant Faateete, as the head coach, ran practices and was responsible for overseeing the entire football program and supervising Defendant Bruck and the other coaches, Defendant Faateete personally participated in the constitutional violation. Plaintiffs argue that by allowing C.M. to practice and failing to supervise Defendant Bruck to ensure that Defendant Bruck was not putting players with symptoms of a concussion back into practice and play without medical clearance, Defendant Faateete personally participated in the constitutional violation. Plaintiffs also argue that Defendant Faateete was deliberately indifferent to whether Defendant Bruck was returning players to practice and play without medical clearance after a concussion because Defendant Faateete did not require C.M. to provide a medical release to return to play. Plaintiffs argue that Defendant Usher is liable as Defendants Faateete and Bruck's supervisor for doing nothing beyond making sure that coaches

received annual concussion training to ensure that coaches did not return any athlete to practice and play without medical clearance after the athlete sustains a concussion.

None of the evidence in the record suggests that Defendant Faateete knew or should have known about C.M.'s September 2016 injury. There is no evidence in the record that Defendant Faateete was at the September 2016 game or that any of the other coaches or players told Defendant Faateete that C.M. had suffered a head injury in the September 2016 game. Defendant Faateete knew that Defendant Bruck and the other coaches knew that they should not return concussed players to practice and play until they no longer exhibited symptoms of a concussion and received medical clearance. Had Defendant Bruck followed that policy, the constitutional injury would not have occurred. Nothing in the record suggests that Defendant Faateete had any reason to suspect that Defendant Bruck was not complying with that policy. There is no evidence in the record that Defendant Faateete knew that the coaches he supervised previously had returned concussed players to practice and play without proper medical clearance or had any reason to know or be able to foresee that Defendant Bruck would do so. As a result, no reasonable juror could conclude that Defendant Faateete knew or should have known that Defendant Bruck or any other coaches would violate Plaintiffs' constitutional rights. Thus, Plaintiffs' § 1983 claims against Defendant Faateete must be dismissed. *See Keates*, 883 F.3d at 1242 (affirming district court's dismissal of § 1983 claim against supervisor because the complaint did not allege that the supervisor had personal involvement or "knew of unconstitutional conditions and 'culpable actions of his subordinates' but failed to act").

The same is true for Defendant Usher. Defendant Usher oversaw the athletic programs at C.M.'s high school and was responsible for the training and supervision of Defendants Faateete and Emery. Defendant Usher was also responsible for implementing school board policies,

including the concussion policy requiring students to obtain medical clearance before returning

to practice and play, and was responsible for ensuring that the athletic staff complied with those

policies. Usher Dep. 16:15–21, 21:11–22:22, ECF 34-5. Defendant Usher was responsible for

ensuring that every coach took the required concussion training before beginning each sport

season, and he did so. *Id*. 24:13–25:16. There is no evidence in the record that Defendant Usher

knew that C.M. had been injured in the September 2016 game, was involved in the decision to

return C.M. to practice and play, knew or should have known that Defendant Emery would tell

C.M. that he could return to practice and play without medical clearance, or knew or should have

known that Defendants Faateete or Bruck would put C.M. into practice and play while C.M. still

exhibited signs of a concussion. Defendant Usher ensured that the coaches knew, through their

training, that they should not return concussed players to practice and play until the player no

longer exhibited signs of a concussion and received medical clearance. Defendant Usher had no

reason to believe that Defendants Emery, Faateete, and Bruck were not following that policy. As

a result, no reasonable juror could conclude that Defendant Usher was deliberately indifferent to

Plaintiffs' rights, and Plaintiffs' § 1983 claims against Defendant Usher must be dismissed

because he was not a cause of Plaintiffs' constitutional injuries.

### D. Qualified Immunity

The Individual Defendants, who Plaintiffs sue in their individual capacities, argue that

they are entitled to qualified immunity. The Individual Defendants argue first that they did not

violate C.M.'s constitutional right to bodily autonomy because C.M. was not injured in the

September 2016 game.[5] Alternatively, if he was, Defendants argue it was not clearly established

---

[5] The Court has already determined that a question of fact remains concerning whether C.M. was
injured during the September 2016 game. *See* Section I(A)(i)(b)(1), *supra*.

in 2016 that "a football coach would violate an athlete's substantive due process rights . . . [or] the substantive due process rights of an athlete's parents by allowing the athlete to play in a football game" after sustaining a concussion in a previous game without clearance from a doctor. Def. Mot. 27–28. Plaintiffs argue that because O.R.S. 336.485 and O.A.R. 581-022-2215[6] protected C.M.'s right to bodily autonomy, and Defendants knew that their conduct would violate those laws, the Individual Defendants are not entitled to qualified immunity.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (alterations and internal quotation marks omitted). Qualified immunity is "'an immunity from suit rather than a mere defense to liability.'" *Pearson v. Callahan*, 555 U.S. 223,  231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1986)). To overcome the assertion of qualified immunity, a plaintiff must show that (1) the defendant's conduct itself amounted to a constitutional violation and (2) the right was "clearly established" when the conduct occurred. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *abrogated on other grounds by Pearson*, 555 U.S. at 242.

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *City and Cnty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015) (quotation marks omitted); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). Although existing cases need not be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."

---

[6] The parties assert in their briefing that O.A.R. 581-022-2215 is the relevant administrative rule that implemented O.R.S. 336.485. That version of the administrative rule did not go into effect until 2017. The relevant version of the rule, effective in October 2016, is O.A.R. 581-022-0421 (2015).

*White*, 137 S. Ct. at 551 (internal quotation marks omitted). Qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

"Because the focus is on whether the [official] had fair notice that [his or] her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau*, 543 U.S. at 198. To determine whether a right was clearly established, courts first look to binding precedent of the Supreme Court and Ninth Circuit and, if none exists, then to "whatever decisional law is available . . . including decisions of state courts, other circuits, and district courts" to determine "whether the Ninth Circuit or Supreme Court, at the time the out-of-circuit opinions were rendered, would have reached the same results." *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004) (internal quotation marks and citations omitted).

　　　　　i.　　　Defining the right

The parties disagree about what constitutional right is relevant to the qualified immunity analysis. Plaintiffs argue that the relevant right is C.M.'s right to bodily autonomy. The Court heeds the Supreme Court's caution that the relevant right must not be defined at a high level of generality. *See Sheehan*, 135 S. Ct. at 1775–76. Instead, the relevant right is defined by examining the Individual Defendants' conduct, so that the Court can determine whether the Individual Defendants should have known that their conduct would violate Plaintiffs' constitutional rights. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established.") (internal quotation marks and citation omitted) (emphasis in original); *Nelson v. City of Davis*, 685 F.3d 867, 883 (9th Cir. 2012) ("The determination whether a right was clearly established must be undertaken in the light of the specific context of the case, not as a broad general proposition.") (internal

citations and quotation marks omitted). Thus, the Court finds that the relevant question is whether C.M. had a clearly established right to remain out of practice and play after he sustained a concussion while he continued to experience signs and symptoms of which his coach was aware until he received a medical release from a doctor. With respect to Todd and Dawna Martin, the relevant question is whether they had a clearly established right not to have their child returned to practice and play after their child sustained a concussion while he continued to experience signs and symptoms of which his coach was aware until he received medical clearance from a doctor.

ii.    Whether the right was clearly established

The parties have identified no cases which establish that the Individual Defendants would have known that they would violate C.M.'s and Todd and Dawna Martin's substantive due process rights when they returned C.M. to practice and play without medical clearance while C.M. continued to exhibit concussion symptoms. But that is not the end of the inquiry. "[A] person's liberty is equally protected, even when the liberty itself is a statutory creation of the State." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

a.    Whether the state statute and regulation created a liberty interest protected by the Fourteenth Amendment

A state statute is relevant to determining whether a right is clearly established only if it "provides the basis for the cause of action sued upon." *Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) (emphasis omitted). In *Davis*, the Supreme Court confronted the question of whether an official was entitled to qualified immunity when "the official's conduct violated a state regulation as well as a provision of the Federal Constitution." *Id.* at 190. The state regulation at issue in *Davis* required state officials to give state employees an opportunity to be heard in a pre-termination or a prompt post-termination hearing when the state terminated their employment.

*Id.* at 187–88. The Supreme Court rejected the plaintiff's argument that, although irrelevant to whether a constitutional violation occurred, the state regulation was decisive of the question of whether the defendants were entitled to qualified immunity. *Id.* at 191.

After holding that the state did not violate any clearly established rights, the Court addressed whether, in general, the "violation of a clear statute or regulation, although not itself the basis of suit, should deprive the official of qualified immunity from damages for violation of other statutory or constitutional provisions." *Id.* at 192–93. The Supreme Court answered that question in the negative, explaining the problems with the unworkability of such a rule. *Id.* at 195–96. The Court further explained:

> [O]fficials sued for violations of rights conferred by a statute or regulation, like officials sued for violation of constitutional rights, do not forfeit their immunity by violating some other statute or regulation. Rather, these officials become liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages. And if a statute or regulation does give rise to a cause of action for damages, clear violation of the statute or regulation forfeits immunity only with respect to damages caused by that violation . . . . Neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation—of federal or of state law—unless that statute or regulation provides the basis for the cause of action sued upon.

*Id.* at 194 n.12. The Court was clear, however, that "[s]tate law may bear upon a claim under the Due Process Clause when the . . . interests protected by the Fourteenth Amendment are created by state law." *Id.* at 193 n.11. Thus, whether the Oregon statute and administrative rule identified by Plaintiffs is relevant to the Court's qualified immunity analysis turns on whether the Oregon statute and regulation created a liberty interest protected by the Fourteenth Amendment. *See Wolff*, 418 U.S. at 557 (The court must determine whether the state-created "interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle [the plaintiff] to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.").

Plaintiffs' argument that the Oregon statute and regulation create a liberty interest protected by the Fourteenth Amendment is based on the Ninth Circuit's decision in *Carlo v. City of Chino*. Pl. Resp. 43–44. In *Carlo*, the Ninth Circuit applied *Davis* to determine whether the existence of a state statute that formed the basis for the plaintiff's claim demonstrated that the right was clearly established. 105 F.3d 493, 500 (9th Cir. 1997). *Carlo* involved a California statute that gave arrestees the right to make three phone calls within three hours of arrest unless it was physically impossible to do so. *Id*. at 495. After officers arrested the plaintiff, she asked officers to make a phone call several times, and the officers did not allow her to make a call until more than a day and a half later. *Id*. The issue on appeal was whether the plaintiff, by establishing that the officers who denied her the right to make calls violated the California statute, had established that the officers violated a clearly established constitutional right and had no right to qualified immunity. *Id*. at 497.

After holding that the California statute created a liberty interest, the court held that the liberty interest was one of "real substance" that was entitled to due process protection. *Id*. at 499–500. By violating the state statute, the officers had also violated the plaintiff's Fourteenth Amendment substantive due process rights. *Id*. at 500. Turning to qualified immunity, the court held that the liberty interest created by the California statute was clearly established. *Id*. at 502. The court also discussed precedent from the Sixth and Seventh Circuits and agreed with the Seventh Circuit: "there was no right to qualified immunity because it was established that state laws creating a liberty interest are protected by the federal Constitution. We agree with the Seventh Circuit's holding that '[t]here is no novelty to this claim . . . and therefore no basis for a defense of immunity.'" *Id*. (quoting *Anderson v. Romero*, 72 F.3d 518, 527 (7th Cir. 1995)). As a result, the court held that the officers had no right to qualified immunity based on their

deprivation of the liberty interest created by the California statute. *Id.* ("Given the clarity of the statute and the law defining liberty interests at the time, no reasonable officer could have believed that denying Carlo telephone calls did not violate her constitutional rights.").

There is little case law about whether a statute designed in some manner to protect children demonstrates that a child's liberty interest is clearly established. *In Doe ex rel. Doe v. Petaluma City Sch. Dist.*, the Ninth Circuit addressed whether Title IX clearly established that a school official had a duty to protect a student from reported sexual harassment. 54 F.3d 1447, 1450 (9th Cir. 1995). The Ninth Circuit was clear that *Davis* requires the court to "focus on the right [the plaintiff] alleges was violated," and the plaintiff had alleged that the right the defendant had violated was Title IX's requirement that the school official had a duty to prevent sexual harassment of the plaintiff. *Id.* at 1451. The court held that the law interpreting Title IX at the time of the alleged harassment did not place a duty on school officials to prevent peer harassment, so the right was not clearly established. *Id.* 1451.

The Court finds that the Oregon statute and regulation at issue created a liberty interest protected by the Fourteenth Amendment that was clearly established at the time of the October 2016 game. It is undisputed that O.R.S. 336.485 (2015) and *former* O.A.R. 581-022-0421 (2015) were in effect in 2016.

In 2016, O.R.S. 336.485 provided, in relevant part:

(3) Except as provided in subsection (4) of this section:

    (a)  A coach may not allow a member of a school athletic team to participate in any athletic event or training on the same day that the member:

        (A) Exhibits signs, symptoms or behaviors consistent with a concussion following an observed or suspected blow to the head or body; or

        (B) Has been diagnosed with a concussion.

     (b) A coach may allow a member of a school athletic team who is prohibited from participating in an athletic event or training, as described in paragraph (a) of this subsection, to participate in an athletic event or training no sooner than the day after the member experienced a blow to the head or body and only after the member:

          (A) No longer exhibits signs, symptoms or behaviors consistent with a concussion; and

          (B) Receives a medical release from a qualified health care professional.

O.R.S 336.485(3) (2015) (amended 2017). Oregon Administrative Rules implementing O.R.S. 336.485 (2015) provided that each school district shall:

     (2)(f) Ensure no coach allows a member of a school athletic team to participate in any athletic event or training on the same calendar day that the member:

          (A) Exhibits signs, symptoms or behaviors consistent with a concussion following an observed or suspected blow to the head or body; or

          (B) Has been diagnosed with a concussion.

O.A.R. 581-022-0421(2)(f) (2015) (amended and renumbered 581-022-2215 in 2017).

     The Court finds that the Oregon statute and regulation cited above created a liberty interest in members of a school athletic program to be free from exposure to the risk of further injury after suffering from or appearing to suffer from a concussion until a healthcare professional clears the member to return to athletic participation. The statute and regulation place a clear mandate on coaches and school districts to ensure that coaches do not return players with a known or suspected concussion to practice and play until a medical processional has found it safe for the player to do so. The state statute and regulation serve no other purpose than to protect school athletic participants from sustaining repeat head injuries before they have properly healed and received medical clearance.

///

///

The Court has dismissed Defendants Usher and Faateete because they did not cause Plaintiffs' constitutional violations. *See* Section I(C)(ii), *supra*. Thus, the Court analyzes only the remaining Individual Defendants' entitlement to qualified immunity.

iii.    Defendant Bruck

The violation of the statute undergirds Plaintiffs' § 1983 claim against Defendant Bruck. The statute controls the conduct of coaches to protect students. By violating the statute, Defendant Bruck affirmatively placed C.M. in a position of greater danger than he was in before Defendant Bruck returned C.M. to practice and play and caused the violation of C.M.'s fundamental right to bodily autonomy. As a result, a reasonable coach in Defendant Bruck's position would have known that their conduct violated the law when they returned C.M. to practice and play after C.M. sustained a concussion, continued to exhibit symptoms, and had not received medical clearance from a qualified healthcare professional. Thus, the rights at the heart of C.M.'s § 1983 claims were clearly established in October 2016, and Defendant Bruck is not entitled to qualified immunity from C.M.'s § 1983 claim.

Defendant Bruck's violation of the statute and regulation also caused Plaintiffs Todd and Dawna Martin's constitutional harms. However, the Oregon statute does not create a parent's liberty interest because the statute does not put coaches on notice that violating the statute would violate a parent's constitutional rights. As a result, Defendant Bruck is entitled to qualified immunity from Todd and Dawna Martin's § 1983 claims.

iv.    Defendant Emery

The statute and regulation place affirmative obligations on coaches and school districts, but that obligation is not extended to athletic trainers. The statute and regulation do not place athletic trainers on notice that returning an athlete who had received a concussion to practice and

play while the athlete continues to exhibit symptoms and has not received medical clearance

would violate the law. The statute and regulation thus do not demonstrate that the Fourteenth

Amendment rights at issue were clearly established vis-à-vis Defendant Emery's conduct.

Because the statute and regulation did not place Defendant Emery—an athletic trainer—on

notice that Plaintiffs' substantive due process rights were clearly established at the time of the

October 2016 game, Defendant Emery is entitled to qualified immunity from Plaintiffs' § 1983

claims.

### E.    *Monell* **Claim Against Hermiston School District 8R**

Defendant Hermiston School District 8R ("the School District") moves for summary

judgment on Plaintiffs' *Monell* claims on two grounds. First, it argues that no constitutional

violation occurred. Second, the School District argues that the alleged constitutional violation

was not caused by a final policy maker, ratified by a final policymaker, or caused by a

longstanding practice or custom that amounts to a formal policy.

To prevail on a municipal liability claim under § 1983, Plaintiffs must show that a

municipal custom or policy caused the violation of their constitutional rights. *Monell*, 436 U.S. at

690 (holding that a municipality is a "person" subject to liability under § 1983 when it causes a

constitutional tort through "a policy statement, ordinance, regulation, or decision officially

adopted and promulgated by that body's officers"). If no constitutional violation occurred, then a

municipal liability claim fails under § 1983. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (a

*Monell* claim cannot survive without an underlying constitutional violation). To establish *Monell*

liability, Plaintiffs must show a constitutional violation caused by (1) an employee acting under

an expressly adopted official policy; (2) an employee acting under a longstanding practice or

custom that amounts to an official policy; or (3) an employee acting as a final policymaker. *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).

The Court has found that a question of fact remains about whether a constitutional violation occurred, so the Court analyzes each of the avenues through which Plaintiffs allege *Monell* liability against the School District to determine whether the School District is entitled to summary judgment on Plaintiffs' *Monell* claims.

i.    Official Policy

A "decision to adopt [a] particular course of action . . . by th[e] government's authorized decisionmakers . . . surely represents an act of official government 'policy.'" *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986), *superseded in part by statute as recognized in Francis v. Carroll*, 659 F. Supp. 2d 619, 626 (D. Del. 2009). *Monell* liability attaches when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id*. at 483 (citing *Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985) (plurality opinion)). To meet the deliberate indifference standard, Plaintiffs must show that "the need for more or different action 'is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.'" *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1477–78 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

An official policy under § 1983 may be a policy of action or inaction. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *Harris*, 489 U.S. at 388). A government body's "failure to implement procedural safeguards to prevent constitutional violations" is a policy of inaction that may cause a constitutional violation. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128,

1143 (9th Cir. 2012). To establish a policy of deliberately indifferent inaction, Plaintiffs must show that the School District "'was on actual or constructive notice that its omission would likely result in a constitutional violation' and that 'the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy.'" *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (quoting *Tsao*, 698 F.3d at 1143, 1145). Whether a government entity acted with deliberate indifference to the constitutional rights of citizens generally is a jury question. *Berry v. Baca*, 379 F.3d 764, 769 (9th Cir. 2004).

The School District argues that it is entitled to summary judgment because the School District did not have "a formal policy, or a routine practice, of returning athletes to play without proper clearance." Def. Reply 23, ECF 32. Plaintiffs argue that the relevant policy is the School District's policy of inaction to track athlete concussions and verify that concussed athletes return to play only after their symptoms resolved and they received the appropriate medical clearance. Pl. Resp. 36. The School District's decision not to implement a procedure for tracking player head injuries and ensuring that a player who sustained a concussion or suspected concussion did not return to practice or play without proper medical clearance, Plaintiffs argue, was so obviously deficient that it establishes the School District's deliberate indifference to Plaintiffs' constitutional rights. Pl. Resp. 35. Plaintiffs argue that requiring coaches to complete annual concussion training was insufficient without an accompanying procedure to "[e]nsure [that] no coach allows a member of a school athletic team to participate in any athletic event or training" after the player exhibits signs and symptoms of a concussion without proper medical clearance, as required by O.A.R. 581-022-0421(2)(f) (2015). The Court agrees.

Plaintiffs produced undisputed evidence that the School District had no procedure to ensure that coaches did not return athletes to play after they sustained a concussion without

medical clearance. Usher Dep. 27: 3–14, 33:3–18 (explaining that he did nothing beyond requiring coaches to complete annual concussion training to ensure coaches' compliance with "Max's Law," referring to O.R.S. 336.485 (2015) and O.A.R. 581-022-0421 (2015)). Defendant Usher testified that the first time he helped develop a School District policy for management of student concussions was in 2018. Usher Dep. 21:11–22:22. Defendant Usher relied mainly on Defendant Emery, who was not a School District employee, to track students who exhibited signs of a concussion, but he did not verify that Defendant Emery or C.M.'s coaches effectively tracked players' concussions. Usher Dep. 25:17–26:2; 35:5–15; 41:10–42:5; 95:10–19.

Defendant Emery also had no formal system for tracking athlete concussions. Emery Dep. 12:1–13; Pascone Am. Decl. Ex. 2 at 5, ECF 34-2. Defendant Emery testified that he sometimes, but not always, made a note on his calendar when students came to see him. Emery Dep. 48:8–16. Defendant Emery testified that he always completed an injury report when a student reported an injury, but he kept them in his office, and the School Sistrict did not require him to provide those reports to School District personnel. Usher Dep. 41:10–24. Defendant Emery had a more formal process for returning athletes to practice and play after they recover, but he did not keep written records about that five-day process. *Id.* at 20:12–21:22.

Defendant Bruck testified that although one of his duties was to instruct athletes about the proper procedure for reporting injuries, he could not remember if he had discussed that procedure with the players on his team. Bruck Dep. 28:22–29:21. Coaches simply sent players who suffered a blow to the head or exhibited signs of a concussion to see Defendant Emery for evaluation. Usher Dep. 33:3–10. There was no established process for how athlete concussions should be reported to Defendant Emery. When a player sustained a concussion at an away game,

for example, Defendant Emery testified that the coach, the athletic trainer for the opposing team, or the parent would notify him of the injury. Emery Dep. 36:6–13.

The School District also had no set process for what should occur after a player reported a concussion to Defendant Emery. Defendant Emery testified that he would complete an injury report and perform a concussion exam. Emery Dep. 37:4–9. Defendant Emery orally communicated reports of injury to Defendants Usher, Faateete, and Bruck at practices or notified them by email. Defendant Usher testified that either he or Defendant Emery typically would notify coaches by email about players who were restricted from play. Usher Dep. 95:10–19. But it does not appear that the coaches or athletic trainer always immediately notified Defendant Usher about athlete injuries. Usher Dep. 41:8–42:5 (explaining that Defendant Emery does not send Defendant Usher injury report forms and that Defendant Emery would sometimes show them to Defendant Usher when Defendant Usher went to Defendant Emery's office). Defendant Usher testified that either he or Defendant Emery would notify coaches about athletes who could not participate in athletics because of a concussion or other injury. Usher Dep. 95:10–19, 105:3–16.

Defendant Emery had no set process for when and how he told Defendants Faateete and Bruck about players who required medical clearance before returning to practice and play. Defendant Bruck testified that he would find out about athletes who had been restricted from practice and play by talking to Defendant Faateete or Defendant Emery. Bruck Dep. 36:1–11. When asked whether he made a written note about which players were restricted from play or kept an injury list, Defendant Bruck testified: "Usually if a player's restricted from playing, they're not dressed. They have their pads off, their helmet off. They don't practice or play." Bruck Dep. 37:8–14.

Coach Lopez testified that it was not one of his responsibilities to notify the school administration about player injuries. Lopez Dep. 25:12–23. Coach Posten testified that reports of injuries and which players required medical clearance to return to play were communicated to Defendant Emery. Posten Dep. 27:11–19. Coach Posten was also unaware of any record kept by the coaches or Defendant Emery that identified which players required medical clearance before returning to play. Posten Dep. 36:13–37:11.

Defendant Emery testified that when he referred an athlete to a doctor, he had no further involvement until he began the five-day return to play process. Emery Dep. 43:13–21 ("once the doctor releases them, if they come back to play, then that's when I come back into the situation."). Defendants Emery, Faateete, Bruck, and Usher seemed to have no process to ensure that each player on the field during practices and games had received medical clearance when required. *Id.* at 20:12–22:5.

Viewing the evidence in the light most favorable to Plaintiffs, a jury could conclude from those facts that the School District acted with deliberate indifference to the constitutional rights of its players. The School District lacked a process for identifying which players required medical clearance before returning to practice and play. Without a list of concussed players who required a medical release before returning to practice and play, the coaches and athletic trainers appear to have relied on memory and informal communications to keep track of the injuries of the 85 to 100 players on the school's football teams. Under that method of informal communication, a student athlete who had suffered a concussion and required a medical release to return to play could dress for practice and return to play without the coaches or school administration taking notice.

With no way to verify with accuracy that only players who had received medical clearance following a concussion participated in practices and games, it should have been obvious to the School District that a coach could return a concussed player to practice and play without medical clearance. It was also obvious that a player could suffer a serious injury or even death if the player sustained another head injury. As a result, a reasonable juror could conclude that the inadequacy of the School District's informal memory-dependent method of tracking student concussions was so obvious and the risk of a constitutional violation so likely to occur that the School District was deliberately indifferent to the constitutional rights of C.M. and his parents. *See Oviatt*, 954 F.2d at 1477–78 (affirming jury's finding of deliberate indifference because county knew that without a procedure to ensure that inmates received prompt pretrial hearings it was virtually certain that constitutional violations would occur and that "[t]he need for different procedures was so obvious that [the sheriff's] adamant refusal to take action amounted to deliberate indifference to the detainees' constitutional rights"); *cf. R.H.*, 2012 WL 4068674, at *5–6 (finding that the plaintiffs had sufficiently alleged deliberate indifference by alleging facts that established that the "[d]efendants were deliberately indifferent to the known danger of permitting an underweight and underskilled beginner wrestler to compete against an experienced, significantly heavier wrestler.").

The second step of the *Monell* liability analysis requires the Court to determine whether a reasonable juror could conclude that the lack of an adequate procedure was the moving force behind Plaintiffs' alleged constitutional harms. *Monell*, 436 U.S. at 694–95. Defendant offered no argument that Defendants' policy of inaction was not the moving force behind the alleged constitutional violation. Thus, the Court need not address that question.

///

ii.       Failure to train

*Monell* liability can also arise from a failure to train, supervise, or discipline that amounts to an official policy of deliberate indifference to an individual's constitutional rights. *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). The School District may be liable on a failure to train or supervise theory when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can be said to have been deliberately indifferent to the need." *Harris*, 489 U.S. at 388–89. To demonstrate a municipality's deliberate indifference to its inadequate training program, the plaintiff usually must show a pattern of similar constitutional violations caused by inadequate training. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61 (citing *Tuttle*, 471 U.S. at 822–23).

Plaintiffs argue that the School District's failure to train its employees and coaches about the requirements of the Oregon statute and regulation shows its deliberate indifference to the constitutional rights of its players and their parents. The School District argues that it adequately trained the coaches to keep players out of practice and play after the player receives a concussion until the player receives medical clearance and no longer exhibits signs and symptoms. The Court agrees.

Coaches Faateete and Bruck completed the annual concussion training required by Oregon law. Fry Decl. Ex. 7 at 32, ECF 16-7; Fry Decl. Ex. 4 at 24. Coaches Posten and Lopez also completed annual concussion training. Posten Dep. 20:2–8; Lopez Dep. 26:20–25. Defendants Bruck, Emery, and Faateete knew that an athlete who had sustained a concussion or

suspected concussion should not return to practice and play without first receiving medical clearance. Emery Dep. 45:2–10; Bruck Dep. 59:23–60:5; Fry Decl. Ex. 7 at 92:13–94:12. Defendant Usher and Defendant Emery also testified that the coaches knew that they should not return a player to practice and play after the player suffers a concussion until they no longer have symptoms and receive medical clearance. Usher Dep. 34:4–9, 35:5–15; Emery Dep. 45:2–7. The School District did not have to train its employees on the specifics of the Oregon statute and regulation if it met the requirements of the statute and regulation. Those requirements included requiring coaches to take annual concussion training and ensuring that coaches knew that they should not return players with a concussion or a suspected concussion to sports until the player is symptom-free and received clearance from a doctor to return to athletic participation. The undisputed evidence establishes that the coaches and other School District personnel knew those requirements.

Plaintiffs can establish deliberate indifference on a failure to train theory only if the School District knew that its training was constitutionally inadequate and continued to use the same training method despite the known or obvious risk that constitutional violations that would result from the inadequate training. *See Harris*, 489 U.S. at 388–89. Even if Plaintiffs could show that the employees' training was inadequate, Plaintiffs have produced no evidence that the School District's policymakers knew or should have known about a pattern of constitutional violations caused by the inadequate training and chose to continue the same course. Without that showing, Plaintiffs cannot establish that the School District was deliberately indifferent to constitutionally inadequate training. Although Plaintiffs produced evidence that coaches returned both C.M. and another player who sustained a concussion to play without medical clearance during the 2016 season, there is no evidence that the School District knew that its training was

constitutionally inadequate before those incidents occurred and chose not to improve it with that knowledge. Because Plaintiffs have not established that constitutional violations had resulted from any inadequacy of the School District's training program that was known to the School District before Plaintiffs' alleged constitutional violations occurred, Plaintiffs failed to meet their burden to establish deliberate indifference. *See Connick*, 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").

Plaintiffs may establish *Monell* liability without showing a pattern of constitutional violations if it was obvious to the School District that the School District's failure to train would lead to constitutional violations. *Id.* at 64. Single-incident liability is rare and found only "in a narrow range of circumstances." *Bryan Cnty.*, 520 U.S. at 409. It was not "so patently obvious" to the School District that failing to train its employees on the specific mandates of the Oregon statute and regulation would lead to a constitutional violation when the School District employees knew that they should not return players who had received concussions to practice and play without medical clearance. *See Connick*, 563 U.S. at 68 ("[F]ailure-to-train liability is concerned with the substance of the training, not the particular instructional format."). Plaintiffs have not established a question of fact that the training the School District provided to its employees was constitutionally inadequate and that the inadequacy was patently obvious to the School District. Consequently, the Court grants the School District summary judgment on Plaintiffs' failure-to-train *Monell* claim.

        iii.        Failure to supervise

The Court analyzes whether the School District was deliberately indifferent to a failure to supervise in the same manner as it analyzes an alleged failure to train. *Horton*, 915 F.3d at 602–

03. Thus, to establish *Monell* liability based on a failure to supervise, Plaintiffs must show that the School District's failure to supervise its employees amounted to deliberate indifference to the need for adequate supervision. *Harris*, 489 U.S. at 388–89. Plaintiffs can establish the School District's deliberate indifference by showing a pattern of similar constitutional violations caused by a failure to supervise or by the rare single-incident liability theory discussed in *Connick* and *Bryan County*.

Plaintiffs produced no evidence that shows a pattern of similar constitutional violations caused by the School District's failure to supervise its employees that was known to the School District before Plaintiffs' alleged constitutional violations occurred. Thus, Plaintiffs' failure to supervise *Monell* liability theory turns on whether they can establish that this case falls within the "narrow range of circumstances" in which single-incident liability occurs. *Bryan Cnty.*, 520 U.S. at 409. Plaintiffs argue that the School District's failure to supervise its coaches and athletic trainer to ensure that they did not return a student who had suffered a concussion to play sports without proper medical clearance falls within that narrow range of circumstances.

Plaintiffs have not established that the constitutional consequences of the School District's failure to supervise its employees were patently obvious to the School District. Although the parties dispute the degree of supervision that Defendant Usher should have exercised over Defendants Emery, Faateete, and Bruck, Defendant Usher did supervise them to some degree. Defendant Usher testified that he ensured that the coaches and athletic trainer knew that they should not return an athlete to practice and play without medical clearance if the athlete suffered a concussion. At times, Defendant Usher met with Defendant Emery and discussed the status of athlete injuries, including concussions. Defendant Usher sometimes communicated to coaches about whether an athlete had received medical clearance to return to play after an injury.

Defendant Usher also attended some of the games. Although he could have done more to supervise the other Individual Defendants, under those circumstances, it was not "highly predictable" or "patently obvious" to the School District that its supervision of Defendant Usher, the coaches, and the athletic trainer would cause constitutional violations. Plaintiffs have not established that a question of material fact remains concerning whether the School District's supervision of its employees was patently obvious to lead to constitutional violations. As a result, the Court grants the School District summary judgment on Plaintiffs' *Monell* claim based on a failure to supervise.

## II.    C.M.'s Negligence Claims

Plaintiff C.M. brings several negligence and negligence per se claims against Defendants. C.M. alleges that Defendants were negligent when they: (1) returned C.M. to play in the September 2016 game after he had sustained a concussion; (2) returned C.M. to practice and play after he received a concussion in the September 2016 game when C.M. continued to experience symptoms of a concussion; and (3) failed adequately to train administrators, coaches, athletic trainers, and employees to refer a player who received a concussion for medical evaluation and treatment and to notify parents of the need for medical evaluation and treatment.[7] FAC ¶ 73. Defendants move for summary judgment on those claims and C.M.'s negligence per se claims.

///

///

///

---

[7] C.M. also claims that Defendants were negligent when they returned C.M. to practice and play after the September 2016 game without medical clearance; failed adequately to train administrators, coaches, athletic trainers, and employees that they cannot return an athlete to practice and play after the athlete sustains a concussion until the athlete obtains medical clearance; and failed to administer an ImPACT test on C.M. after he sustained a concussion. FAC ¶ 73. Defendants do not move for summary judgment on those claims.

A.    **Negligence**

To establish a claim of negligence in Oregon, a plaintiff must prove that (1) the defendant's conduct caused a foreseeable risk of harm; (2) the risk is to an interest of a kind that the law protects against negligent invasion; (3) the defendant's conduct was unreasonable because of that risk; (4) the conduct was a cause of the plaintiff's harm; and (5) the plaintiff was within the class of persons and the plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent. *Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495, 506 (2010). Negligence generally is a question for the jury. *Jones v. Oberg*, 52 Or. App. 601, 607 (1981).

Defendants argue that C.M. produced no evidence to support his negligence claims because there is no question of fact that C.M. did not play in the first half of the September 2016 game. Because a question of fact remains concerning whether C.M. played during the first half of the September 2016 game and received a concussion, Defendants are not entitled to summary judgment on C.M.'s negligence claims on that basis. Thus, the Court addresses Defendants' remaining arguments about Plaintiff C.M.'s allegations of negligent training and causation and finds that those arguments also turn on questions of disputed fact that a jury must resolve.

i.    Returning C.M. to practice and play during and after the September 2016 game

Defendants also argue that they are entitled to summary judgment on C.M.'s negligence claims based on C.M.'s return to practice and play without medical clearance because Defendants did not cause C.M.'s damages when Defendants (1) returned C.M. to play in the September 2016 game after he suffered a concussion earlier in the game, and (2) allowed him to practice and play during the weeks between the September and October 2016 games because C.M. was not injured during those practices and games.

Whether Defendants caused C.M.'s harm depends on whether C.M.'s injury would not have occurred but for Defendants' negligent conduct. *Joshi v. Providence Health Sys. Of Or. Corp.*, 342 Or. 152, 161–62 (2006) (noting that but-for causation is the standard applied to most negligence cases). C.M. does not bring independent negligence claims that created distinct damages. Instead, C.M.'s First Amended Complaint alleges a series of negligent acts that culminated in C.M.'s injuries during the October 2016 game. FAC ¶¶ 73–75 (alleging that Defendants were negligent in "one or more" of the ways alleged and that negligence caused C.M.'s injuries and damages). The record demonstrates that C.M. suffered concussion symptoms during and after the September 2016 game, and C.M.'s physician opined that returning C.M. to play before his September 2016 concussion had healed left C.M.'s brain "vulnerable to further injury and sensitive to any increased stress." Earl Decl. ¶ 8, ECF 30.

Dr. Earl's opinion suggests that C.M.'s ultimate October 2016 injury would not have occurred but for Defendants' negligence in returning C.M. to practice and play. A jury could conclude that by returning C.M. to practice and play, Defendants prevented C.M. from healing from the September 2016 concussion or prolonged his recovery so that his brain remained vulnerable to another injury until the October 2016 game, causing or contributing to the severity of his October 2016 injury. *Id.* ¶ 6 ("C.M. did not adequately clear from a first concussion at the Mountain View game in September, and . . . the October 20, 2016[,] injury . . . resulted in a significant and severe extension of that initial concussion."). That evidence creates a question of fact concerning whether C.M.'s injury would have occurred but for Defendants' actions in returning C.M. to practice and play during the September 2016 game and thereafter. As a result, Defendants are not entitled to summary judgment on C.M.'s negligence claims.

///

57 – OPINION & ORDER

i.        Negligent Training

Defendants argue that because each of the coaches received the annual concussion training required by O.R.S. 336.485 (2015) and O.A.R. 581-022-0421 (2015), no question of fact remains that Defendants provided adequate training to its coaches that they cannot return athletes to practice and play following an athlete's concussion unless the athlete receives medical clearance. C.M. argues that a question of fact remains about the adequacy of Defendants' training because the School District provided its coaches only the annual concussion training required by the Oregon statute and regulation and failed to track the effectiveness of that training by ensuring that coaches implemented the training they received. Pl. Resp. 46.

C.M. has produced sufficient evidence to create a question of fact concerning whether the School District negligently trained C.M.'s coaches. First, it is undisputed that the School District provided only the concussion training required by O.R.S. 385.485 to its coaches. The evidence, viewed in the light most favorable to C.M., suggests that C.M. reported a head injury to Defendant Bruck and exhibited symptoms of a concussion at the September 2016 game. Despite C.M.'s concussion and resulting symptoms, C.M.'s coaches returned him to play in the same game, and Defendant Emery told C.M. a few days later that C.M. could return to practice and play without medical clearance. C.M. continued to report his ongoing headaches to Defendant Bruck, who allowed C.M. to continue to practice and play. A reasonable juror could infer from those facts that, by providing its coaches only the training required by the Oregon statute, the School District's training failed to protect C.M. from a foreseeable risk of harm. As a result, summary judgment on C.M.'s failure-to-train theory of negligence is inappropriate.

Defendants also argue that there is no evidence that the School District inadequately trained its administrators, coaches, and athletic trainers to recognize, evaluate, and care for

athletes who sustain a concussion. The evidence, when viewed in the light most favorable to C.M., demonstrates that C.M. sustained a concussion in the September 2016 game, and his coaches either failed to recognize or identify it, or they put C.M. back into practice and play despite recognizing C.M.'s concussion symptoms. After the game, Defendant Bruck told Todd Martin that C.M. was fine, and did not tell Mr. Martin about C.M.'s concussion. The evidence also suggests that Defendant Emery identified the concussion the next day but did not tell C.M. or his parents that a medical provider should evaluate C.M. before he returned to practice and play. Nor did Defendant Bruck refer C.M. to the athletic trainer or for medical evaluation when C.M. continued to complain of headaches to Defendant Bruck later. From that evidence, a reasonable juror could conclude that the School District inadequately trained its employees and athletic trainer about how to recognize, evaluate, and care for athlete concussions. As a result, summary judgment is improper.

### B.    Negligence Per Se

C.M. alleges that Defendants were negligent per se because they violated O.R.S. 336.485 (2015) and O.A.R. 581-022-0421 (2015) when they (1) returned C.M. to play during the September 2016 game on the same calendar day that he had exhibited signs of a concussion following an observed or suspected blow to the head; (2) returned C.M. to practice and play after the September 2016 game without medical clearance while he continued to exhibits symptoms of a concussion; and (3) failed to ensure that the coaches, assistant coaches, and athletic trainers at C.M.'s school received training which includes (i) recognizing the signs and symptoms of concussion; (ii) strategies to reduce the risk of concussions; (iii) seeking proper medical treatment for a person suspected of having a concussion; (iv) determining when the athlete may safely return to the event or training; and (v) complying with laws prohibiting concussed athletes

from returning to events or training without a medical release from a qualified health care professional. FAC ¶ 79.

"Negligence *per se* is not a separate claim for relief, but a theory of liability for negligence in which the standard of care is expressed by a statute or rule." *Doe ex rel. Farley, Piazza & Assoc. v. Gladstone Sch. Dist.*, No. 3:10-cv-01172-JE, 2012 WL 2049173, at *14 (D. Or. Jun. 6, 2012) (quoting *Shahtout v. Emco Garbage Co.*, 298 Or. 598, 601 (1985)). To establish negligence per se, a plaintiff must first show that the statute or regulation at issue establishes a standard of care. If O.R.S. 335.485 (2015) and O.A.R. 581-022-0421 (2015) established a duty of care, then a plaintiff can establish negligence per se by showing that (1) the defendant violated the statute or regulation; (2) the plaintiff was injured as a result of that violation; (3) the plaintiff was a member of the class of persons the statute and regulation intended to protect; and (4) the plaintiff suffered a type of injury that the statute or regulation was enacted to prevent. *Miller v. Goodyear Tire & Rubber Co.*, 434 F. Supp. 3d 877, 884 (D. Or. 2020) (citing *McAlpine v. Multnomah Cnty.*, 131 Or. App. 136, 144 (1994)).

Defendants do not dispute that O.R.S. 336.485 (2015) and O.A.R. 581-022-0421 (2015) established a duty of care. Defendants argue that C.M. failed to establish the second element of negligence per se—that Defendants' violation of the statute and regulation caused his injury— with respect C.M.'s claim that Defendants returned him to play in the September 2016 game after his head injury earlier in that game. Def. Mot. 31–32. Defendants argue that there is no question of fact that C.M. did not sustain a second injury during the September 2016 game after Defendants returned C.M. to play, so Defendants were not negligent per se. The Court disagrees. C.M.'s First Amended Complaint outlines a pattern of negligent conduct by Defendants that led to C.M.'s October 2016 injury or an extension of his September 2016 injury; it does not allege

separate acts of negligence for which C.M. seeks separate damages. In addition, viewing the evidence in the light most favorable to C.M., Dr. Earl's opinion establishes a question of fact concerning whether C.M.'s continued practice and play following his concussion in the September 2016 game was a cause of his harm. Earl Decl. ¶ 8.

Defendants also argue that C.M.'s claim that the School District provided inadequate concussion training to its coaches should be dismissed because the School District provided its coaches all training required by the statute and regulation. Def. Mot. 32. The undisputed record evidence confirms that Defendants Faateete and Bruck received annual concussion training before the 2016 football season began. So, too, did C.M.'s other coaches, Coach Lopez and Coach Posten. C.M. has produced no evidence of the substance of the concussion training provided to the coaches that establishes that it was inadequate or that it did not cover all the topics required by the Oregon statute and regulation. Because the statute and regulation required only coaches to receive concussion training, C.M. cannot establish that the School District was negligent per se based on any other Defendant's failure to complete the concussion training. No reasonable juror could conclude from the record that the School District failed to provide the annual concussion training to its coaches as required by the statute and regulation. Thus, Defendants are entitled to summary judgment on C.M.'s negligence per se theory of liability for failing to provide coaches and other School District staff adequate concussion training.

## CONCLUSION

Defendants' Motion for Summary Judgment [15] is GRANTED IN PART and DENIED IN PART as follows: (1) The Court grants Defendants Usher and Faateete summary judgment on Plaintiffs' § 1983 claims; (2) Defendant Bruck is entitled to qualified immunity from Todd and Dawna Martin's § 1983 claims; (3) Defendant Emery is entitled to qualified immunity from all

Plaintiffs' § 1983 claims; (4) Plaintiffs' *Monell* claims against Hermiston School District 8R

based on a failure to train and failure to supervise are dismissed; (5) The Court denies the School

District's motion for summary judgment on Plaintiffs' remaining *Monell* claims; (6) Defendants'

motion for summary judgment on C.M.'s negligence claims is denied; (7) The Court grants

Defendants summary judgment on C.M.'s negligence per se claim based on inadequate

concussion training and denies Defendants' motion on C.M.'s other theories of negligence per se

liability.

 IT IS SO ORDERED.


 DATED: November 4, 2020 .



           MARCO A. HERNÁNDEZ
           United States District Judge